******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* J.M.F.*
(AC 37200)

Lavine, Mullins and Harper, Js.

*Argued September 20, 2016—officially released January 10, 2017*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, Comerford, J.)

*Moira L. Buckley*, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney,
with whom, on the brief, were *Richard J. Colangelo*,
*Jr.*, state's attorney, and *David I. Cohen*, former state's
attorney, for the appellee (state).

*Opinion*

MULLINS, J. The defendant, J.M.F., appeals from the judgment of conviction of attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a (a), assault in the first degree in violation of General Statutes § 53a-59 (a) (1), and risk of injury to a child in violation of General Statutes § 53-21 (a) (1). On appeal, the defendant raises the following seven claims: (1) the trial court abused its discretion by imposing a sanction against him that precluded him from raising an affirmative defense of mental disease or defect, ultimately violating his constitutional rights to present a defense and to due process of law; (2) the trial court erroneously concluded that he unequivocally invoked his right to self-representation and that he knowingly, intelligently, and voluntary waived his right to counsel; (3) the trial court deprived him of his right to due process of law by failing to order, sua sponte, that he undergo a competency evaluation; (4) the state unconstitutionally interfered with his right to counsel; (5) the trial court improperly continued to trial despite the existence of an appellate stay, which rendered the results of the trial void ab initio; (6) the trial court abused its discretion by not appointing a special public defender, ultimately violating his constitutional rights to counsel and to due process of law; and (7) the trial court violated his rights to due process of law and to present a defense when it refused his request to instruct the jury on renunciation and diminished capacity. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. After thirteen years of marriage, on January 4, 2010, the defendant's wife served him with divorce papers.

On January 6, 2010, two days after having received the divorce papers, the defendant asked his wife to withdraw the dissolution action; she refused to do so, but she did agree that she would file a motion for reconciliation if the defendant would agree to go to counseling. After putting the children to bed for the evening, the defendant and his wife retired to their bedroom.

In the bedroom, they began to discuss the ensuing divorce. As they did so, the defendant became enraged. He tackled his wife, knocking her to the floor, and he put his hands around her neck while slamming her head into the floor. The defendant told her: "I'm killing you." He repeatedly hit her in the face and body with his fists, pulled out her hair and put his hands around her neck. At one point, he threw her to the other side of the bedroom, where she landed in front of the fireplace. She "felt like [she] was dying [and] . . . was in incredible pain." The defendant then knelt on top of her and repeatedly hit her in the face and head with a metal flashlight. She lost consciousness approximately three

times during the attack.

After this attack, the defendant retreated to the master bathroom where he called to his wife, telling her that he was going to kill himself and that he needed her assistance to do so. She did not go into the bathroom, but, instead, believing she was dying and wanting to save her children, she accessed the security alarm in the bedroom. The defendant again became enraged and tackled her. He then told her that he was going to the kitchen to get a knife to cut his jugular vein. When the defendant went downstairs, she gathered up the children and drove them to the home of a neighbor. The neighbor called the police.

When the police arrived at the defendant's home, the defendant surrendered peacefully. The police located a belt, attached to a pole in the closet, which the defendant said he used to try to hang himself. The defendant was charged with and convicted of attempt to commit murder, assault in the first degree, and risk of injury to a child. He received a total effective sentence of fifteen years imprisonment, followed by five years of special parole, and the court imposed a full criminal restraining order. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

On appeal, the defendant first claims the trial court abused its discretion by imposing a sanction against him for his refusal to sign the authorization forms that were required by the state's expert before the expert would conduct a psychiatric examination of the defendant. In particular, the defendant argues that the sanction improperly precluded him from raising a mental disease or defect affirmative defense,[1] ultimately violating his constitutional rights to present a defense and to due process of law.

Specifically, the defendant argues: "Assuming, arguendo, that [he] violated the court's . . . order, the trial abused its discretion by precluding him from asserting the mental disease or defect defense. The court's extreme remedy was unnecessary to protect the state from prejudice. The court failed to weigh the rationale for exclusion against the defendant's right to present a defense. Considering the factors articulated in [*State* v. *Tutson*, 278 Conn. 715, 899 A.2d 598 (2006), the defendant's] alleged violation was not substantive, but 'technical.' " The defendant further argues: "In circumstances such as this, preclusion of a defense should not be the court's knee jerk reaction where other less prejudicial remedies are available."

In response, the state argues that the trial court properly granted the state's motion to preclude defense "[a]fter concluding that the defendant had continually engaged in dilatory tactics with the intent of ambushing the state with regard to his defense of not guilty by

reason of mental disease or defect . . . . In light of his failure to comply with Practice Book § 40-19,[2] preclusion was not abuse of discretion." (Citations omitted; footnote added.) We conclude that the court did not abuse its discretion.

To provide the proper context for the trial court's ruling and ensure a full understanding of the procedural history of this case, we set forth the following detailed facts, which inform our review of the defendant's claim. The defendant was arrested in relation to this case in January, 2010. Shortly thereafter, beginning in early 2010, he retained Attorneys Eugene J. Riccio and Timothy J. Moynahan to represent him. In September, 2010, the defendant requested a continuance to further consider the psychiatric aspects of his case, which the court granted. In April, 2011, the case was placed on the jury list.

On August 20, 2012, the court inquired as to whether the defendant intended to assert a defense of mental disease or defect. The defendant responded that he did not have the funds to be evaluated for such a defense at that time.[3] Thereafter, on September 5, 2012, the defendant filed a notice of defense of extreme emotional disturbance. On November 13, 2012, the state represented that the attorneys in the civil assault action; see footnote 3 of this opinion; had agreed to release $25,000 from the prejudgment remedy attachment. The court continued the matter.

On January 25, 2013, the defendant filed an amended notice of his defense to include the defense of mental disease or defect. On February 1, 2013, the defendant asked for another continuance to work on his affirmative defense, which the court granted.

On March 22, 2013, the defendant informed the court that he was now working with Howard V. Zonana, a psychiatrist, on his affirmative defense, but that he needed more time. He requested a continuance to April 4, 2013, "to complete that work," which the court granted. The court explained, however, that it had set the matter down for trial to begin in the middle of April.

On April 4, 2013, the defendant informed the court that he now intended to represent himself during his criminal trial. The trial court informed the defendant that it did not want the trial in this matter to suffer any further delays, and it ordered the matter continued for a *Faretta* hearing. See *Faretta* v. *California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975) (requiring inquiry by court when defendant seeks to waive counsel and represent himself).

On April 10, and April 12, 2013, the court conducted a *Faretta* hearing. On the first day of this hearing, April 10, 2013, the defendant stated that he "would welcome the assistance of a public defender." In response, the court inquired as to whether the defendant had applied

for those services, and the defendant said he had not applied. The court then requested the presence of a representative from the public defender's office to determine whether the defendant qualified for services from that office. During this hearing, the defendant also confirmed that he was pursuing a defense of mental disease or defect. He also informed the court that he had been under psychiatric care for forty months, that he had engaged the services of a psychiatrist who was trained in the area of his defense and who was in the process of performing an examination of him. He further informed the court that he had engaged the services of a neuropsychiatrist, who also was doing neurological testing on him.

On the second day of the *Faretta* hearing, April 12, 2013, before proceeding with the hearing, the court heard from Attorney Barry Butler from the public defender's office. Butler informed the court that his office had concluded that the defendant was not indigent and, therefore, did not qualify for its services. The court then considered the defendant's request to represent himself, and ultimately granted his request. The court nonetheless appointed the defendant's previous counsel, Riccio and Moynahan, as standby counsel for the defendant.

At this point in time, the defendant informed the court that he now had sufficient funds for his experts. He also stated that he had an appointment scheduled with Leslie Lothstein, a forensic psychologist, who was an expected witness and was someone whom the defendant had been seeing for forty months. He also told the court he had an appointment with Godfrey Pearlson, a psychiatrist, at the Olin Neuropsychiatry Research Center for a functional magnetic resonance imaging (FMRI) examination. The defendant also explained that he still had been seeing Zonana. The court scheduled a status conference for April 23, 2013. The court told the defendant that it expected him to inform the court at that status conference whether his experts would be issuing reports.

At the April 23, 2013 status conference, however, the defendant informed the court that Pearlson had performed the FMRI, but that a report would not be available that week.[4] He also explained that Zonana and Lothstein would not be able to issue their reports until after they had reviewed Pearlson's report. The court gave the defendant thirty days to produce the written reports, so that the state would have time to take appropriate action after receipt thereof, and it scheduled another status conference for May 21, 2013.

At the May 21, 2013 status conference, the defendant stated that Zonana had received "something" from Pearlson, but that he, the defendant, was "reluctant to get any information" from his experts. The defendant explained that this was because the prosecutors had

indicated that they felt that "there [was] nothing that could constitute . . . attorney work product" in the defendant's case even though he was a self-represented party and a member of the Connecticut bar. The defendant requested a continuance of approximately two and one-half weeks.

The court cautioned the defendant that "this is not a chess game," and that it did not want to see a situation where the defendant was attempting to put forth a defense of mental disease or defect without any expert reports. The court also clearly informed the defendant that the state needed this information to prepare for trial. The court then continued the matter to June 11, 2013, stating that it expected that the state would have the reports by that time and would know what it wanted to do in response thereto.

On June 11, 2013, the defendant informed the court that the FMRI had been conducted on April 16, 2013, that Pearlson and Zonana had been reviewing the results, but had not yet issued a report to the defendant. He further explained that Zonana could not issue such a report until the defendant had a CAT scan, which was scheduled for June 13, 2013. The court gave the defendant more time. The court, however, specifically informed the defendant that his experts needed to have their reports ready by July 2, 2013, or the court would consider precluding the expert testimony.

At the hearing on July 2, 2013, the defendant informed the court that his experts wanted him to see Ruben Gur, a neuropsychiatrist, who was in the process of consulting with Pearlson. The defendant also told the court that he had given Zonana the freedom to withdraw from the case, and that Zonana had decided to withdraw. The court explained that it had given the defendant considerable leeway to contact and secure experts in this case, but, that, with the withdrawal of Zonana, it appeared that the situation would be "unending." The court also told the defendant that it would not delay his trial much further, and that it would not allow an expert to testify unless the state knew what the expert would opine. The court then continued the matter to August 15, 2013, and it clearly told the defendant that this was "the end time frame for Zonana, Pearlson or Gur to issue a necessary report or indicate to [the court] that no report will be forthcoming . . . . These doctors better have their reports in so that [the prosecutors] can be fairly apprised of their position on it. If they don't have it in, I will take the appropriate action that is necessary, but you are forewarned that I am not going to delay this any further because I can see this coming from left field that we are going to be talking about this at Christmas time—not going to happen."

At the August 15, 2013 hearing, the defendant argued a motion for protective order before the court, claiming that he was entitled to the court's "protection of all

matters, material, and work product associated or related to the defendant's role and responsibilities as a self-represented party, including medical examination and communications with experts, arising from the defendant's role as a self-represented party." After expressing deep concern regarding the delays in the defendant's case while the defendant dealt with his experts, the court opined that the defendant's motion was disingenuous and that the defendant was "playing games with the system." The court then stated that it was not going to tell the defendant what he could or could not do with his experts in this case, and that Practice Book § 40-31 identified what information was subject to disclosure. The court denied his motion concluding that it lacked merit.

The defendant then informed the court that he had informed his experts that, because he had an appeal pending related to the denial of his application for a public defender, "it was inopportune for [him] to continue communications with them until a decision was made on the public defender, or until a decision was made on the protective order." The court told the defendant that it saw no reason why the defendant would need a public defender in order to be interviewed, and it concluded that the defendant was employing delay tactics: "I find that you have acted in a pattern . . . . And I'm going to give you one month. [If] you don't have those professional reports in here one month from today's date, completed, with copies to the state of Connecticut so that the state's attorney can do what analysis they deem appropriate . . . then I will entertain the appropriate motion by the state. . . . So you [have] one month to get them in. If you don't get them in, then I will take the appropriate action. . . . I cannot allow this to go on any longer. There's a clear pattern here. Your intent is to be dilatory and delay everything. Your intent is to interfere with the normal flow of court business and the trial schedule of the court. Your actions are indicative of same. And you're doing so under the guise of protecting your constitutional rights. I just don't agree with you. I see what you're doing." On August 26, 2013, the defendant filed an interlocutory appeal challenging the court's denial of his motion for a protective order.[5]

On September 3, 2013, the court inquired about the defendant's communications with his experts. At this point, the defendant refused to give the court any information regarding his experts, stating that the information was confidential. On September 12, 2013, the defendant again refused to give the court information about his experts and cited the appellate stay that he claimed resulted from his interlocutory appeal of the court's order denying his protective order as a reason to not move ahead in his criminal case. The state thereafter filed a motion to terminate stay pursuant to Practice Book § 61-13 (d), which the trial court granted on Octo-

ber 23, 2013.[6]

On January 21 and 29, 2014, the trial court heard the defendant's appeal from the decision of the office of the public defender. See footnote 4 of this opinion. The court upheld the decision of the office of the public defender, concluding that the defendant was not indigent.[7]

On March 12, 2014, the court informed the defendant that he had thirty days to produce any expert reports related to his proposed affirmative defense of mental disease or defect, and it, again, expressed its displeasure with the defendant's delay tactics. The court stated: "Over the last year and a half, this has been said over and over again, and, to this day, neither the state nor the court has seen anything from the defendant with regard to mental status in this case, even though, clearly, he has been obligated to do so." The court continued the matter for one month, to April 11, 2014, and announced that a trial date would be set at that time.

On April 11, 2014, the defendant gave the state a report from Lothstein, and indicated that the report was based on Lothstein's examination of the defendant in 2010 and on the FMRI from April, 2013. The court then told the parties that jury selection would commence on June 17, 2014.

Meanwhile, on April 28, 2014, the state filed a motion for psychiatric examination in accordance with Practice Book § 40-19; see footnote 2 of this opinion; which the court heard on April 29, 2014. The state explained that it had received the defendant's report from Lothstein on April 11, 2014, and it reviewed it over the following week and retained its own expert, Justin Schechter, a forensic psychiatrist. The state informed the court that after Schechter had reviewed Lothstein's report, Schechter expressed a desire to examine the defendant before rendering his own opinion on the defendant's defense of mental disease or defect. The state further explained that before it had filed its formal motion for psychiatric examination, it had met with the defendant and attempted to schedule an appointment with the defendant and Schechter, but the defendant objected to an examination, prompting the state to file its formal motion.

The defendant argued that he wanted time to consider and respond to the state's motion. He also argued that he was "not refusing the examination . . . [but] was asking the court to be engaged because [he] view[ed] the court . . . as having the responsibility to protect [his] rights as an individual . . . particularly as a self-represented individual." The defendant then complained that the state had approximately four years to examine him but that it had not attempted to do so during that time, and he stated that he did not understand the significance of conducting an examination

now, in light of the fact that he had been undergoing therapy for approximately fifty-two months.

The court granted the state's motion for a psychiatric examination, stating: "*You will provide the state's expert with any authorizations that are necessary to complete the work up by the state's expert in this matter.* You can make it known to him if you have problems with the scheduling of the examination. He can weigh that for what he deems appropriate. You can, at time of trial, file . . . whatever in limine motion you deem appropriate." (Emphasis added.) The court also ordered the defendant to appear at Schechter's office at 5 p.m. that evening.

On April 30, 2014, the state filed a motion to preclude the defendant from asserting a defense of mental disease or defect and to hold him in contempt, to which he objected. At a May 1, 2014 hearing on this motion, the state informed the court that the defendant had appeared at Schechter's office as ordered, but that he refused to read, have read to him, or sign Schechter's standard consent form. The state argued that the defendant refused to cooperate with Schechter as the court had ordered, that this was nothing more than a delay tactic, and that the court should grant its motion to preclude, as well as find the defendant in contempt.

The defendant contended that he fully had complied with the court's order by showing up at Schechter's office. He argued that he had not consented to the examination, and, therefore, was not required to sign a consent form, and that he was at Schechter's office because the court had ordered him to be there. He also argued that it was Schechter, not he, who refused to continue with the examination without the form. The defendant asked that the examination be rescheduled and conducted in accordance with the court's order, and that the court review Schechter's consent form before requiring him to sign it.

The court stated that it specifically had ordered the defendant to provide the necessary authorization to Schechter, and that the defendant's actions were a violation of the court's order. The court also stated: "The defendant's action in this case speaks far louder than words. The court has been more than patient . . . in allowing, time after time, a delay of this case at his request for various reasons. The court [previously] set a date for the commencement of selection of a jury in this case, and it's clear to me that the actions of the defendant are intended to continue and delay any progress in this matter. Notwithstanding his words, his actions speak very clearly here. I don't intend to allow anybody to make a joke out of our system. And, while I intend to protect the rights of the defendant, I think the record is replete that I have done so in this particular case.

"I also have an obligation [to] the people to get the matter resolved. And I've made my position quite clear. I'm not going to let anybody manipulate or play games with the system. It's as simple as that. And that's exactly what's being done here.

"The defendant's objection, therefore, is denied. And the court finds that he has failed to comply with a court order here. I made myself perfectly clear the other day. I not only said that he would report for an examination by Dr. Schechter, but I made it clear that he would sign any authorization that would be provided by Dr. Schechter. . . .

"The defendant in this case continues as a self-represented party to assert certain privileges that he has asserted for years by way of argument, motions, and, in this particular case, clearly, I think that assertion was meant to delay all along. He knew what he was doing. He knows what he's doing. He's making a record here, and I think he's just thwarting the process.

"I think his actions are quite clear. So, his objection is overruled or denied, if you will. We're done playing games with the system. The motion that was filed by the state for a finding of contempt and for a preclusion of the defense will be denied in part and granted in part. That is to say, the motion for contempt is denied . . . [but] the state's motion to preclude a defense based upon the defendant's mental status is granted in this case."[8] The court then told the parties to be prepared for jury selection on May 27, 2014, as previously ordered, and that the start of evidence was scheduled to begin on June 17, 2014.[9]

On appeal, the defendant claims that the court abused its discretion by precluding him, because of a mere "technical" violation of the court's order, from raising a defense of mental disease or defect, ultimately violating his constitutional rights to present a defense and to due process of law. In support of his claim, he relies in relevant part on *State* v. *Tutson*, supra, 278 Conn. 740. Both parties have asked and agreed that we should employ an abuse of discretion standard of review. We conclude that the court did not abuse its discretion in precluding the defendant's defense as a sanction for his failure to comply with the court's order.

We initially set forth the legal principles governing our resolution of this claim, as well as our standard of review. "Practice Book §§ 757 through 761 [now §§ 40-17 through 40-19], inclusive, relate to defenses based on the defendant's mental state. If the defendant intends to rely on such defense or if he intends to introduce expert testimony relating to a mental disease or defect or to any other condition bearing upon the issue whether he had the requisite mental state for the offense charged, he is required to notify the prosecuting authority in writing of such intention and to furnish him with

copies of pertinent medical reports. The prosecutor may then move to have the defendant examined by a psychiatrist of the state's choice and in an appropriate case the court may order that the defendant be so examined. In the event of a failure of the defendant to give the required notice, furnish appropriate reports, or submit to the ordered examination, the court may exclude the testimony of any expert witness offered by the defendant on the issue of his mental state." *State* v. *Lovelace*, 191 Conn. 545, 549, 469 A.2d 391 (1983) (holding court did not abuse its discretion in excluding testimony on issue of defendant's mental state when defendant failed to comply with rules of practice), cert. denied, 465 U.S. 1107, 104 S. Ct. 1613, 80 L. Ed. 2d 142 (1984).

"Although we recognize that the right of a defendant to present a defense is subject to appropriate supervision by the trial court in accordance with established rules of procedure and evidence . . . we are also mindful that the fair opportunity to establish a defense is a fundamental element of due process of law . . . and that our rules should not be applied mechanistically so as to restrict unreasonably that important right." (Citations omitted; internal quotation marks omitted.) *State* v. *Carter*, 228 Conn. 412, 426–27, 636 A.2d 821 (1994).

"The sixth amendment does not confer the right to present testimony free from the legitimate demands of the adversary system. . . . The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played. . . .

"We recognize, however, as have most courts addressing the issue, that exclusion of [evidence supporting a defense, such as the testimony of an alibi witness,] may not be justified in all cases where the defendant has failed to comply with the discovery rules. The trial court must weigh the need for exclusion against the defendant's right to present a defense. . . . The decision is within the sound discretion of the trial court and will turn on the facts of the particular case. Factors which the trial court must consider include: whether the disclosure violation was technical or substantial, the timing of the ultimate disclosure, the reason, if any, for the violation, the degree of prejudice to the parties respectively offering and opposing the evidence, whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance." (Internal quotation marks omitted.) *State* v. *Tutson*, supra, 278 Conn. 740.

Here, the defendant focuses primarily on the purported reasonableness of his refusal to sign Schechter's consent form and the alleged lack of prejudice that refusal caused to the state because the defendant stated at the May 1, 2014 hearing that he now would sign the

form if the court ordered him to do so and submit to the examination. The state contends that it was not an abuse of discretion for the court to preclude the defense of mental disease or defect after looking at the repeated delays caused by the defendant related to his defense and then to consider whether the defendant's refusal to sign the consent form was just another delay in a long line of delay tactics. We agree with the state.

Pursuant to Practice Book §§ 40-17 and 40-18, the defendant was required to provide written notice of his intent to assert a defense of mental disease or defect and to provide the names of his experts. The defendant also was required to provide the state, within five days of receipt, copies of the reports prepared by any experts whom the defendant would call as witnesses. The state then had five days to file a motion to have the defendant examined by the state's expert. See Practice Book § 40-19.

In April, 2010, Lothstein examined the defendant. In April, 2013, three years after the defendant was examined by Lothstein, the defendant underwent an FMRI with Pearlson. At an April 23, 2013 status conference, the court asked the defendant if his experts would be issuing reports. The defendant informed the court that Pearlson had performed an FMRI, but that a report would not be available that week. He also stated that Zonana and Lothstein would not be able to issue their reports until after they had reviewed Pearlson's report. The court gave the defendant thirty days to produce the written reports, so that the state would have time to take appropriate action after receipt thereof.

When those thirty days elapsed, rather than provide the court with any reports, the defendant claimed that he did not want to divulge any information from his experts because he was concerned about "attorney work product," since he was now self-represented and also an attorney. At this point, the court warned the defendant that this was not "a chess game," and it cautioned him that it was concerned about his delay tactics and the state's need for this information in order to prepare for trial.

In June, 2013, after yet another continuance, the court told the defendant that if the reports of his experts were not ready by July 2, 2013, the court would consider precluding the testimony of his experts. On July 2, 2013, with no reports forthcoming, the court continued the matter to August 15, 2013, but clearly told the defendant that this was "the end time frame" for his experts to have their reports ready so that the state could prepare for trial. The court cautioned the defendant that it would not delay this matter any further, and that it did not want this matter continuing through the end of the year.

Yet, still, additional delays followed. Those delays included, but were not limited to, the defendant's volun-

tary discharge of Zonana, his filing of an interlocutory appeal regarding his motion for a protective order, his appeal from the decision of the office of the public defender finding that he was not indigent, his repeated assertions to the court that communications with his experts were confidential attorney work product because he was an attorney and was acting as his own attorney in this case, and his citing of an appellate stay as a reason not to give the court any information on his experts or to proceed with his criminal case. In fact, the defendant did not produce Lothstein's written report until April, 2014. Indeed, it is quite clear from this detailed history that the court had been asking for the defendant to produce the reports of his experts and that it granted continuance after continuance to allow him time to produce those reports from April, 2013, until April, 2014, despite its repeated and pointed warnings that it did not want further delays and that the state needed these reports to prepare properly for trial.

Once the defendant finally produced an expert report, and the state sought to have the defendant examined by Schechter, the defendant then sought time to file a written objection to the state's requested evaluation, and he argued that there would be no worth to a new evaluation at this late date, more than four years after the crimes. Thereafter, despite the court's order to provide Schechter with all necessary authorizations, the defendant refused to read, to have read to him, or to sign Schechter's consent form. Thus, the court's express finding that the defendant sought to continue and delay this matter by employing dilatory tactics that both delayed the proceedings and thwarted the judicial process certainly was not a "knee jerk reaction" as the defendant argues on appeal; it is supported by the extensive record in this case. Furthermore, the court repeatedly warned the defendant that his tactics could result in the preclusion of his defense.

Thus, on the facts of this case, we conclude that the defendant's refusal to read, have read to him, or to sign Schechter's consent form so that an evaluation could be performed was not a mere "technical" violation of the court's order, but, rather, it was part of the defendant's campaign to manipulate the system and delay the trial in this matter. Accordingly, the court did not abuse its discretion in precluding the defendant from asserting a defense of mental disease or defect.

II

The defendant next claims that the court erroneously concluded that he unequivocally invoked his right to self-representation during certain stages of the pretrial proceedings and that he knowingly, intelligently, and voluntarily waived his right to counsel in violation of the fifth, sixth and fourteen amendments to the United States constitution, and in violation of article first, § 8, of the Connecticut constitution.[10] The state responds:

"[T]he fact that the defendant sought self-representation as an alternative to continued representation by Attorneys Riccio and Moynahan did not preclude the trial court from finding that he had made a clear and unequivocal request for self-representation. Additionally, the trial court's canvass fully complied with what is constitutionally required, and the court did not abuse its discretion in concluding that the defendant's waiver of his right to counsel was knowing, intelligent and voluntary." We agree with the state.

The following additional facts inform our review. Riccio and Moynahan represented the defendant beginning in early 2010. On April 4, 2013, the defendant filed a pro se appearance in lieu of counsel, and the court proceeded, on April 10, and April 12, 2013, to conduct a *Faretta* hearing. See *Faretta* v. *California*, supra, 422 U.S. 806. The defendant explained to the court that he wanted to represent himself because both attorneys previously had sought to withdraw, and that, in retrospect, he thought the court was wrong in not letting them withdraw.[11] He stated that a hostile relationship had developed between them. The defendant then told the court that he would like the assistance of a public defender, although he had not applied for such assistance.

On the first day of the hearing, April 10, 2013, the court explored the defendant's education and work experience, and it ascertained that the defendant understood the disadvantages and dangers of self-representation. The court further explored the defendant's mental state and the fact that the defendant intended to continue his pursuit of a defense of mental disease or defect. The court inquired as to whether the defendant understood his burden of proof on such a defense and the consequences of the jury accepting that defense.

When asked by the court if he believed he could properly represent himself, the defendant answered that he really did not feel suited to it and that he would not hire himself. The court found that the defendant's request was "artfully" equivocal. The court told the defendant that he would give him time to apply for the services of a public defender, and that, if the defendant did not qualify for such services, the court would continue the *Faretta* inquiry; it also warned the defendant that if he wanted to represent himself, he must be unequivocal, without any hedging. The court then recessed to permit the defendant to talk with a public defender.

On April 12, 2013, the public defender informed the court that the defendant did not qualify financially for the services of the office of the public defender. The court then inquired whether the defendant still wanted to represent himself and whether he had anything else to say. The defendant stated: "You asked a number of questions, and I responded forthrightly to them. *I still*

*feel the need to request the court to allow me to exercise my constitutional right to be a self-represented party in this case.*" (Emphasis added.) The court thanked the defendant for his "clarity," and it opined that the defendant's request to represent himself now had become "pretty unequivocal." The court also told the defendant that it would entertain a request for the addition of private counsel if the defendant indicated a desire for such at a later date.

The court then set forth the following: "I think you've expressed yourself very clearly here today, and you have been clearly advised of your right to appointed counsel. We have explored that option as best we could under the circumstances. Certainly, I find that you possess the intelligence and capacity to appreciate the consequences of self-representation. You understand the nature and complexity of the proceedings and charges and the permissible punishments that would apply to a case such as this.

"And, we have gone through the disadvantages and danger of self-representation. You've expressed yourself rather well in that regard. . . . I'm well aware that you have had a rather stellar legal career . . . . I am convinced at this point in time [however] that it would be in your best interest to have standby counsel in this matter . . . . And at this point in time, I'm going to appoint Mr. Riccio and Mr. Moynahan as your standby counsel in this matter. That's not to say we can't make a change in that if you make a request at a later date based upon your efforts to get other counsel involved in the case.

"If your financial circumstances change, and you wish further review in terms of an indigency petition, I would never preclude you from exploring that as well. I want you to be represented appropriately. I think you're a bright, intelligent man who can do a decent job on your own behalf. On the other hand, there's nothing like having guys who really know how the procedure works like those two men standing right next to you right now . . . . " The defendant objected to the appointment of Riccio and Moynahan as standby counsel, but the court overruled that objection.

On appeal, the defendant now claims that his invocation of his right to self-representation was equivocal and that he did not knowingly, intelligently, and voluntarily waive his right to counsel. We are not persuaded.

"It is well established that [t]he right to counsel and the right to self-representation present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in each, but since the two rights cannot be exercised simultaneously, a defendant must choose between them. When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins. . . . Put

another way, a defendant properly exercises his right to self-representation by knowingly and intelligently waiving his right to representation by counsel. . . .

"The inquiry mandated by Practice Book § 44-3[12] is designed to ensure the knowing and intelligent waiver of counsel that constitutionally is required. . . . We ordinarily review for abuse of discretion a trial court's determination, made after a canvass pursuant to . . . § 44-3, that a defendant has knowingly and voluntarily waived his right to counsel. . . .

"The threshold requirement that the defendant clearly and unequivocally invoke his right to proceed pro se is one of many safeguards of the fundamental right to counsel. . . . Accordingly, [t]he constitutional right of self-representation depends . . . upon its invocation by the defendant in a clear and unequivocal manner. . . . In the absence of a clear and unequivocal assertion of the right to self-representation, a trial court has no independent obligation to inquire into the defendant's interest in representing himself. . . . [Instead] recognition of the right becomes a matter entrusted to the exercise of discretion by the trial court. . . . Conversely, once there has been an unequivocal request for self-representation, a court must undertake an inquiry [pursuant to Practice Book § 44-3], on the record, to inform the defendant of the risks of self-representation and to permit him to make a knowing and intelligent waiver of his right to counsel. . . .

"Although a clear and unequivocal request is required, there is no standard form it must take. [A] defendant does not need to recite some talismanic formula hoping to open the eyes and ears of the court to [that] request. Insofar as the desire to proceed pro se is concerned, [a defendant] must do no more than state his request, either orally or in writing, unambiguously to the court so that no reasonable person can say that the request was not made. . . . Moreover, it is generally incumbent upon the courts to elicit that elevated degree of clarity through a detailed inquiry. That is, the triggering statement in a defendant's attempt to waive his right to counsel need not be punctilious; rather, the dialogue between the court and the defendant must result in a clear and unequivocal statement. . . .

"Finally, in conducting our review, we are cognizant that the context of [a] reference to self-representation is important in determining whether the reference itself was a clear invocation of the right to self-representation. . . . The inquiry is fact intensive and should be based on the totality of the circumstances surrounding the request . . . which may include, inter alia, whether the request was for hybrid representation . . . or merely for the appointment of standby or advisory counsel . . . the trial court's response to a request . . . whether a defendant has consistently vacillated in his request . . . and whether a request is the result of an

emotional outburst . . . ." (Emphasis omitted; footnote added; internal quotation marks omitted.) *State* v. *Pires*, 310 Conn. 222, 230–32, 77 A.3d 87 (2013).

In this case, a thorough review of the hearing conducted April 10 and April 12, 2013, reveals that the court properly found that the defendant expressed an unequivocal invocation of his right to self-representation, and, further, that the defendant knowingly, intelligently, and voluntarily waived his right to representation by counsel. At the hearing, after the court determined that the defendant did not qualify for the services of the public defender, the court then pointedly asked the defendant if he wanted to represent himself. The defendant explicitly told the court: "*I still feel the need to request the court to allow me to exercise my constitutional right to be a self-represented party in this case.*" (Emphasis added.) The trial court found that this request was clear, and it actually thanked the defendant for such "clarity." We conclude that the defendant's invocation of his right of self-representation was clear and unequivocal.

Additionally, in accordance with Practice Book § 44-3, the court conducted an inquiry and found that the defendant was aware of his right to counsel, that he had the intelligence and the capacity to appreciate the consequences of his invocation of his right of self-representation, that he understood the nature of the proceedings and the charges against him, and that he was aware of the dangers and disadvantages of self-representation. The court discussed the defendant's education and work experience, noting that the defendant had a juris doctorate degree and that he had "a vast amount of experience in the business and political world."

The court also explored the defendant's mental state and the fact that he intended to continue his pursuit of a defense of mental disease or defect. The court ensured that the defendant understood his burden of proof on such a defense and the consequences of the jury accepting that defense. The court appointed the defendant's former attorneys as standby counsel, and it also told the defendant that it would entertain a request for the addition of private counsel if the defendant wanted private counsel at a later date. The court further informed that defendant that it would not preclude him from further exploring the appointment of a public defender.

Thus, after reviewing the transcript of the court's *Faretta* inquiry, we conclude that the court properly found that the defendant clearly and unequivocally invoked his right to self-representation and that he made a knowing, intelligent, and voluntary waiver of his right to counsel.

### III

The defendant next claims that the court deprived

him of his right to due process of law by failing to order, sua sponte, that he undergo a competency evaluation. He argues: "On June 12 and 18, [2014][13] the court was confronted with substantial evidence that [the defendant's] competence to stand trial required scrutiny by a mental health professional. The court abused its discretion by failing to order a competency evaluation or hearing." (Footnote added.) The defendant also cites a hearing that occurred on July 2, 2014, as further proof that the court should have ordered a competency evaluation. The following additional facts inform our review.

After learning at the June 12, 2014 status conference that his appellate petitions had been dismissed, all stays had been lifted, and the court was ready to proceed with jury selection on June 18, 2014, the defendant stated: "Your Honor, I have a number of issues I'd like to raise. First of all, I believe I am, at this point, not competent to serve as my own attorney in this matter . . . and I would like to seek to withdraw as a self-represented party.

"Since the appointment in April of 2013, I've gone through a number of mental and psychiatric issues including nearly three weeks of involuntary commitment at the Institute of Living. And, I think, at this point, I just don't have the psychiatric or mental capability of serving as a self-represented party at this time. . . . I believe . . . that I'm in an extraordinary circumstance, and I need the assistance of counsel—of appointed counsel. . . .

"And I just don't think I'm, at this stage, in a position to . . . psychologically, I can't address any of the evidence in the case without having severe anxiety and mental issues associated with it. So preparation has really become an impossible task for me with respect to . . . trial.

"When I met with Dr. Schechter on April 29 at 5 p.m., in fact, in a brief conversation I had with him, he raised the question of whether I was even competent to stand trial after my discussion—brief discussion with him. That question was never further addressed by him because he refused to do the formal . . . examination. . . . And I think the issue is still an outstanding one.

"I have not been examined by a psychiatrist. I have a very extensive report by Dr. Lothstein who's one of the leading forensic psychologists in the world that's been submitted to the state's attorney. . . . I think that would significantly enlighten the court as to some of the mental and neurological issues that I'm confronting. And I would welcome the court's looking into it."

The court asked the defendant for some clarification:

"When you say your competence to stand trial, that's your ability to understand the nature of the charges and the proceedings pending against you and assist in your defense, if you will. . . .

"Obviously, that is exactly why the court all the way back to April of 2013 retained as standby counsel, two exceptionally competent criminal lawyers in this case, either or both of whom have been in attendance throughout all of the various proceedings to date at my order simply because I wanted them to stay abreast of what we were doing with the anticipation that this might be a possibility and they would have to come back in and act as your counsel in this case.

"If that's what you're asking me to do, I don't think that would provide any difficulty. We would certainly have Mr. Riccio and Mr. Moynahan come back into the case as counsel in full, and they would assist you in jury selection and assist you in presentation of the case."

The defendant then asked the court if it would consider the appointment of a different attorney. The court declined and explained to the defendant that Riccio and Moynahan were excellent criminal attorneys with "exemplary resumes." The court also stated: "[S]o, your request that they be replaced, if that's what's being made on the record here today, is not going to happen. That request would be denied. You can have either or both men come in and assist you in the case in jury selection and/or trial. . . .

"Attorney Riccio has been privy to all of the proceedings as we've moved along here. Certainly, if you are asking that—that you not act as your own counsel any further and [that] Attorney Riccio [or] Moynahan or both step in as your counsel in the matter, that could be handled in one of two ways by the court . . . ."

The defendant then stated that he "*just wanted to make sure* [*that he would*] *be represented by counsel*" and that he wanted to proceed by judicial pretrial with competent legal representation. (Emphasis added.) Shortly thereafter, the court asked Riccio to stand near the defendant and to step back into the case as the defendant's attorney.

On June 18, 2014, as the court was about the start jury selection, the court stated that it had a motion by the defendant to reconsider its appointment of counsel. The defendant told the court that he would like a special public defender appointed pursuant to Practice Book § 44-4. He explained that, although he has "a cordial relationship" with current counsel, he was not communicating with them and wanted a different attorney. The defendant again stated that in his brief encounter with Schechter, Schechter "raised the question of whether or not [the defendant] was competent to stand trial," although he acknowledged that Schechter did not conduct an examination of him. The defendant asked the court to read Lothstein's report to get an understanding of the "psychological issues" being faced by the defendant; the defendant also stated that he would like to be excused from jury selection because "it would be

extremely psychologically taxing on [him] to sit through the jury selection process." The defendant also stated that his family dog was having surgery that morning and that he very much wanted to be home with her.

The prosecutor responded by noting that his office and the court already had determined that the defendant was not eligible for a public defender. The prosecutor also noted that it was "obvious" that the defendant understood the nature of the proceedings and that "he certainly fulfills the very low standard of . . . competency." The prosecutor finally noted that if the defendant's attorneys had any question about his competency, they would bring those concerns to the court's attention, but that there was no evidence of incompetency.

The court denied the motion to replace counsel, finding that it was "without merit." The court also explained to the defendant that he has a right to be present at the proceedings, and that jury selection was a "very critical stage in the proceedings." The defendant responded: "I'm in a . . . mental state, and I have a mental status that I think there's a question as to whether or not I could competently endure the trial, and . . . be of assistance during the course of the trial, including during the voir dire. And I don't want to end up committed again, quite frankly." The court then gave both of the defendant's attorneys the opportunity to speak.

Moynahan stated that his advice would be for the defendant to be present during jury selection but that he understood the defendant's desire to be home with his family pet. Riccio stated that jury selection was an important part of the defendant's trial, that he thought the defendant could be helpful to counsel, and that he would prefer to have him there. The court explained that it also was very wary of the defendant being absent, especially in the event that a potential juror did not know him by name but knew him by sight.

The court then ruled that the defendant needed to be present when the court introduced the case to the potential jurors, so that they could determine whether they knew the defendant; if the defendant wanted to leave after that, the court would not prevent him from doing so. The court also explained, "you should be warned on the record, you're doing this at your own peril . . . ." The defendant then asked the court to clarify whether it was ruling that he had to be present during the court's introduction of the case to the jury panel, to which the court replied: "What I'm suggesting to you is that weighing all of the interests of everything involved, and in the interest of justice, and for the good of the process itself, and for the integrity of the process, I'm requiring you to be here . . . at the introduction of the case." The defendant stated that he appreciated the court articulating its ruling.

At a hearing on July 2, 2014, the defendant did not want to proceed with the trial because he had filed his fourth interlocutory appeal the day before, and he argued that there was an appellate stay in place, and that, therefore, he had no obligation to respond to the court. The court gave counsel a copy of its preliminary charge to the jury, and it considered the defendant's request to be absent during the course of the trial. The following colloquy occurred, in relevant part:

"[The Court]: I want to make sure, as I have done all along, that the defendant's rights are assiduously guarded here in these matters. We're talking about important rights of the defendant here, and I want to have the record reflect that we have done everything possible to protect the defendant's rights.

"The record should first reflect that the jury has been selected in this matter. The defendant voluntarily absented himself from the selection process . . . . And now the question that arises is the issue of the defendant's presence at the various stages of the proceedings from this point forward. . . .

"Let me ask you this . . . . Do you understand what I am saying to you here this morning?

"[The Defendant]: I . . . I comprehend what you're saying.

\*\*\*

"The Court: [N]obody's trying to trick anybody here. You have every right, and—and I . . . have warned you all along that it's in your best interest that you be here. You've indicated to me for various reasons, up to this point in time, why you don't wish to be here. . . . I heard you. I listened to you. And I may have to . . . hear you again here this morning on that very issue. The point is, is that, as you know, you have a constitutional right to be present at all critical stages of the prosecution.

"[The Defendant]: I—I do, Your Honor.

"The Court: And if you wish to waive those rights, I have to first make sure you understand what you're doing. And then secondarily, I've got to approve those waivers in the interest of justice. I mean—

"[The Defendant]: Yeah, I totally understand, Your Honor.

"The Court: And I just want to make sure that we're proceeding in the . . . in the right way, and [that] you're fully . . . appreciative of what you're doing here. . . . I don't want to ask you a series of questions where you say to me, I don't know what's going on, or you don't respond. I mean, it's very important that you understand, and I understand the import of your response, and the record reflects the import of your response. And, I'm only doing this to protect you appro-

priately. That's all. . . .

"And, notwithstanding you have taken a regimen of medications all along, as I'm sure . . . you have, based upon some of things you said to me before. I've got to understand that . . . these medications may help you to better understand what we're doing.

"[The Defendant]: And . . . in fact, Your Honor, the odd thing, I am on a regimen. When I come to court, this was my problem on April 29, 2014 . . . . I don't . . . take them because they do have an effect on me. And . . . when I'm coming to court, I don't take the meds. . . . [T]he doctor understand[s] I'm not. . . . But, he also understands, the minute I get home, I take them. . . . So, this morning, no, I did not take the normal . . . medication. . . .

"The Court: All right. . . . So, being off of them, as you say, does that create a situation where you don't have, in your opinion, the mental acuity to understand what we're talking about right now?

"[The Defendant]: Your—Your Honor, I . . . honestly don't know. . . .

"The Court: So, you voluntarily choose not to take them when you come here to court, is that what I'm hearing?

"[The Defendant]: I . . . was advised by the doctor on the days [I'm] going . . . don't take them before you leave the house, you know, wait until you get home. And, so, normally, I take them right after breakfast. So, I don't take them when I come to court.

"The Court: So, the question is there then, do you understand what's going on here today or not?

"[The Defendant]: I—I believe I do, Your Honor.

"The Court: I mean, that's the bottom line of all this. . . . I've got to make sure you have an appreciation of what you're doing here. That's—

"[The Defendant]: I . . . believe I do. I think I have— my psychological and mental status is such that attending proceedings can be very harmful to me in a— in terms of my mental and psychological state.

"I believe that my mental and psychological state does raise questions of my competency to effectively— in fact, it's why I felt the need to withdraw as a self-represented party. It affects my competency to—to assist and participate in the defense.

"And, in fact, as Your Honor knows from the last—Dr. Schechter, the psychiatric expert that the state engaged, one of the questions he had raised on April 29, was whether I was competent to stand trial. That question has not been by addressed by an expert.

"But I question it as to whether or not I have the— I question it to the extent that I did not feel I have the

capability of continuing to serve as a self-represented party in these proceedings. Now, as a pro se party and—in—at the appellate level where it's dealing with matters of law, that—that's a different issue presumably. But—

"The Court: So . . . we're dealing with much more complex issues on the appellate level and matters that require extreme mental acuity. You . . . seem to be able to do that without any difficulty at the appellate level. But here at the trial level, you're telling me that you have difficulty talking to your lawyers here?

"[The Defendant]: . . . . In fact, the reason I am able to do certain paperwork is, when I do get psychologically stressed and troubled, I'm able to break away. I'm able to stop. And I'm able to, essentially, go and do something else. . . .

"The Court: So, everything you have done with me over the past few years in terms of the arguments you've made as a self-represented individual, created all kinds of problems for you. Because the . . . record certainly doesn't reflect that in terms of the . . . quality of the argument you have made before me.

"[The Defendant]: Well, I . . . appreciate that, Your Honor, but it took an enormous amount of time and effort . . . and . . . mental anguish and pain to make . . . it through—to get every one of those filings in and to be prepared. . . .

"The Court: But no doubt you appreciated the import of what you were doing all along?

"[The Defendant]: I felt the need to do it, Your Honor, yes.

"The Court: But you understood what you were doing?

"[The Defendant]: I . . . I . . . yeah . . . certainly I—

"The Court: I mean, it would seem to me that the record . . . would reflect that you certainly understood what you were doing. I mean, there was no indication that a mental state other than someone who was on his A game was right there in front of me during the last two years . . . arguing the various motions you argued."

The defendant then explained that another reason he did not want to be in the courtroom was because "not being present in the courtroom will also lessen the media attention and lessen the prospect of [his] daughters having to deal with seeing it on television."

The court stated: "Well, I can only conclude, based upon this dialogue that we've had, that you truly appreciate then what you're doing here this morning. And you fully understand, and anticipate, certain questions will be asked of you. And you're fully capable and competent to respond to those questions at the

present time.

"Anybody else wish to say anything about that conclusion that the court has reached here? Either the state or defense counsel?"

"[The Prosecutor]: No, Your Honor.

"Attorney Riccio: Not on that particular issue of competence, Your Honor, no."

The court then proceeded to question the defendant regarding his desire to waive his right to be present during each individual portion of his criminal trial. After each question, the defendant acknowledged that he desired to waive his right. Shortly thereafter the court stated: "All right. I think the defendant has expressed himself rather well. And handled himself very well here this morning.

"[The Defendant]: Thank you, Your Honor.

"The Court: And, I think the argument that he had made before this court was very astute . . . .

"The Court: You do understand there are certain downsides to you not being here in terms of assisting . . . in terms of cross-examination of any witnesses that may be presented. You could be of invaluable assistance to those lawyers relative to that. The lawyers are on their own if you're not here to help them out, to discuss what's being testified to here. You understand that? . . .

"[The Defendant]: Yeah, I . . . do, Your Honor. And . . . in fact, if I was in a different mental and psychological state, I would very much want to be here. I don't think I am psychologically capable of being here. I don't think I can be of assistance to counsels through the entire trial.

"And . . . that's why I think it's in my best interest, for my survival, to not be here. And, so I understand the downside, Your Honor. If that . . . I just think the . . . I see another downside, and that is more overwhelming to me than the downside of not being here. . . .

"The Court: . . . State wish to say anything further?

"[The Prosecutor]: No, Your Honor.

"The Court: Anything else from defense counsel here?

"Attorney Moynahan: No, Your Honor."

"[The Defendant]: Your Honor . . . I am not waiving any fifth amendment right by anything that's been said here. And that's been my main concern. I am not waiving any fifth amendment right.

"The Court: Okay. I just want to make sure then the record is reflective that if the court feels, in the interest of justice, your presence is required at any of those critical stages of the proceedings, that the court will

exercise its prerogative to require you to be here.

"[The Defendant]: Your—Your Honor, I understand the . . . vast authority of the court, and I've respected it. I'm an officer of the court. I have been here every time the court has asked me to be here, told me to be here. There's never been any question. . . .

"The Court: All right. The court finds that the defendant has knowingly and voluntarily, freely, and with a complete understanding of the consequences, waived his right to be present during the course of the trial in this matter. From the swearing in of the jury itself, through deliberations.

"The court reserves the right, in the interest of justice, to require the defendant to be here at any particular point in time. The defendant recognizes the power of the court to do so, and the record will reflect the same."

The defendant now claims that these colloquies should have triggered the court to inquire about the defendant's competency to stand trial and to order a competency evaluation. The state contends that there was no substantial evidence proffered during these hearings or in the record that would have led the court to suspect that the defendant could not understand the proceedings or assist in his defense, and, accordingly, the court had no obligation to inquire into the defendant's competency to stand trial. We agree with the state.

"The United States Supreme Court has established that the due process clause of the fourteenth amendment to the United States constitution prohibits the criminal prosecution of a defendant who is not competent to stand trial. . . . Similarly, due process demands that, once a defendant's competence to stand trial has been sufficiently called into question, the trial court must order an adequate hearing on his competence to stand trial . . . .

"In determining whether a defendant's competence has been sufficiently called into doubt so as to necessitate a hearing on the matter, the United States Supreme Court has cautioned that there is no single approach or factor that is most important in establishing competency or lack thereof. . . . [E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts. . . .

"This constitutional background informs the manner in which [General Statutes] § 54-56d, this state's statutory scheme for determining a defendant's competence, operates to ensure that a defendant's right to be competent while standing trial is assured. Under Connecticut law, a defendant is initially presumed to be competent and, unless the court or state initially raises the issue of competency, the defendant is assigned the burden of proving his or her lack of competence by a preponderance of the evidence. . . . However, Connecticut jealously guards this right. . . . Any party before the court—including the court itself—may raise the issue of the defendant's competency at any time during a criminal proceeding by requesting that the court order a competency examination. . . . If the court determines that a party's request for the defendant to undergo a competency examination is justified, and so long as the court concludes that there is probable cause to believe that the defendant committed the crime of which he or she has been accused, the court must order a competency examination of the defendant." (Citations omitted; internal quotation marks omitted.) *State* v. *Dort*, 315 Conn. 151, 162–64, 106 A.3d 277 (2014).

"[T]he process through which a court determines that such a request is, in fact, justified [is not well defined]. This aspect of the process has largely been left to the courts. Section 54-56d provides that a defendant shall not be tried, convicted or sentenced while incompetent and permits a competency hearing to be held whenever it appears that the defendant is unable to understand the proceedings against him or to assist in his own defense. As a matter of due process, the trial court is required to conduct an independent inquiry into the defendant's competence whenever he makes specific factual allegations that, if true, would constitute substantial evidence of mental impairment. . . . Substantial evidence is a term of art. Evidence encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court. Evidence is substantial if it raises a reasonable doubt about the defendant's competency. . . . The trial court should carefully weigh the need for a hearing in each case, but this is not to say that it should be available on demand. The decision to grant a hearing requires the exercise of sound judicial discretion. . . . *State* v. *Lloyd*, 199 Conn. 359, 364–66, 507 A.2d 992 (1986)." (Internal quotation marks omitted.) *State* v. *Dort*, supra, 315 Conn. 165.

Our review of the transcripts of all three hearings, as set forth in particular detail herein, reveals that there was neither evidence nor a serious suggestion that the defendant was incompetent to stand trial. Under our law, the trial court presumes the defendant to be competent to stand trial unless there is evidence of incompe-

tence. See id., 162–63.

On June 12, 2014, the defendant informed the court that he felt he was no longer capable of self-representation because of severe anxiety. He also stated that Schechter had questioned whether the defendant was competent to stand trial; Schechter, however, was the state's expert who *did not evaluate the defendant* because the defendant refused to sign Schechter's consent form. The court immediately questioned what the defendant meant by that statement and whether he was saying that he did not have the ability to understand the proceedings or assist in his defense. A careful review of the transcript reveals that the defendant was not claiming that he did not have the ability to understand the proceedings or assist in his defense. Rather, the defendant himself clarified that his concern was that, due to his mental health, he just did not have the psychiatric or mental capability of serving as a self-represented party at this time, and he simply wanted to make sure that he would be represented by counsel moving forward.[14] In response thereto the court told the defendant that it would appoint counsel for him without difficulty, and the court immediately reappointed counsel for the defendant. There was no substantial evidence that was presented that would have called into question the defendant's competence to stand trial.

At the June 18, 2014 hearing, the defendant explained that he thought it would be "psychologically taxing" to sit through trial and that he could not "offer any assistance to [his] legal counsels," and that, despite his cordiality with current counsel, he wanted the court to appoint a special public defender. The defendant also wanted to be excused from jury selection because his family dog was recovering from surgery. The court declined to appoint a special public defender because the defendant did not qualify financially for such services, and the court ruled that the defendant was required to attend the proceedings during the introduction of the jury to ensure that no one selected knew the defendant. There was no substantial evidence presented during this hearing that would have called into question the defendant's competence to stand trial.

On July 2, 2014, the defendant did not want to proceed with the trial because he had filed his fourth interlocutory appeal the day before, and he argued that there was an appellate stay in place. The defendant then argued his request not to be present during the evidentiary portion of the trial. He told the court that he could not handle the stress of being present at the trial and that he did not think he would be helpful to counsel. The trial court took great pains to question the defendant thoroughly in order to ensure that the defendant knew his rights and understood the dangers of not being present during trial. The court noted the clever legal arguments put forth by the defendant over the course of

the proceedings and that he had been helpful to counsel on several occasions. The court also ascertained that the defendant fully understood what the court was telling him and that he had a full appreciation for what he was doing. The defendant, on several occasions, confirmed that he understood. Neither the defendant nor his counsel presented any evidence that the defendant was not competent to stand trial during that hearing.

On the basis of the foregoing, we conclude that the defendant has failed to demonstrate that the court deprived him of his right to due process of law when it did not hold, sua sponte, a competency hearing or order a competency evaluation. Substantial evidence was not presented during the hearings of June 12, June 18, or July 2, 2014, either individually or when considered in toto, that should have triggered the court to conduct such a hearing or to order an evaluation.

IV

The defendant next claims that "state action interfered with the defendant's right to counsel and deprived him of due process." Specifically, he argues that the prosecutor was obligated, but failed, to secure the release of reasonable funds for the defense in a timely manner, which left him with insufficient funds to secure his experts that were critical to his defense. He claims that the prosecutor's failure to file a writ of mandamus barred him from accessing his personal assets and funds to mount a successful defense and that the court should have granted his motion to dismiss on this basis. The state argues that the court properly denied the motion to dismiss because the defendant's claim is unsupported by the record. We agree that the court properly denied the defendant's motion to dismiss.

The following additional facts are helpful. During the course of the proceedings in the trial court, the defendant filed motions to dismiss the charges against him on July 18, 2012, August 7, 2012, and April 23, 2013. The defendant contended that he had been denied "access to every penny of [his] sizable personal funds, for use in his legal defense." He also argued in relevant part that the state was preventing him from presenting an effective defense and was depriving him of his right to counsel of his choice. He claims that the state deprived him of this right because the Office of the Chief State's Attorney did not assist him by filing a writ of mandamus to help him secure the release of funds in the civil case that his wife had filed against him, and in which she had secured a prejudgment remedy, and in his marital dissolution case, in which his assets were frozen.

The court denied the motions to dismiss in a March 12, 2014 oral decision, which provided in relevant part: "[T]he defendant argues that he was denied, essentially, any funds for defense counsel and costs. His argument

seems to be that the decisions made in the civil and dissolution proceedings denied him, 'access to every penny of the defendant's sizable personal funds, for use in his legal defense.'

"The record simply does not support his argument. . . . Accordingly, the court concludes that the financial assertions he makes as a result of other court action are first, contrary to fact, and second, do not rise to the level of any kind of asserted state action, so as to affect his due process rights in the criminal case.

"The history of the case discloses that the defendant has never been denied counsel of his choice, or access to funds for the purpose of his consulting and obtaining expert opinion and testimony. Indeed, until the defendant exercised his constitutional prerogative to represent himself, he was represented in all proceedings, criminal, civil and dissolution, by experienced and competent counsel.

"His access to counsel in the criminal case has been guarded by the court in their retention as standby counsel. The record should reflect standby counsel is sitting to my right in the jury box here today. They have always been in attendance with regard to the criminal proceedings. . . .

"Simply put, the claims made by the defendant that the civil and dissolution proceedings precluded his due process in this the criminal case are without merit."

We begin by noting the standard that this court applies in reviewing a trial court's ruling on a motion to dismiss. "A motion to dismiss . . . properly attacks the jurisdiction of the court, essentially asserting that the plaintiff cannot as a matter of law and fact state a cause of action that should be heard by the court. . . . [This court's] review of the trial court's ultimate legal conclusion and resulting [denial] of the motion to dismiss will be de novo. . . . Factual findings underlying the court's decision, however, will not be disturbed unless they are clearly erroneous. . . . The applicable legal standard of review for the denial of a motion to dismiss, therefore, generally turns on whether the appellant seeks to challenge the legal conclusions of the trial court or its factual determinations." (Citations omitted; internal quotation marks omitted.) *State* v. *Golodner*, 305 Conn. 330, 338–39, 46 A.3d 71 (2012).

"It is well settled that the guarantee of assistance of counsel under the sixth amendment to the United States constitution encompasses the right to select one's own attorney. It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice. . . . [I]t is well settled that if the decision by a trial court deprived a defendant of his constitutional right to counsel of choice, prejudice will be presumed." (Citation omitted; internal quotation marks omitted.)

*State* v. *Johnson*, 140 Conn. App. 479, 486–87, 59 A.3d 366, cert. denied, 308 Conn. 917, 62 A.3d 527 (2013).

"Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, at the very least, the prosecutor . . . [has] an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Maine* v. *Moulton*, 474 U.S. 159, 170–71, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985).

On appeal, the defendant argues that he did not have access to sufficient funds to obtain counsel of his choice and to secure experts because his assets were frozen in other court actions, and that the prosecutor had an obligation to help him obtain the release of those funds by filing a writ of mandamus. The defendant argues that the prosecutor's failure to file this writ deprived him of certain constitutional rights because it affected his ability to hire counsel of his choice and obtain experts.

Because the court clearly found that defendant "has never been denied counsel of his choice, or access to funds for the purpose of his consulting and obtaining expert opinion and testimony," and the defendant does not challenge this factual finding as clearly erroneous, his claim necessarily fails. Therefore, even if the defendant could establish that a prosecutor has some obligation to assist a defendant with the release of additional funds in cases such as this, the court specifically found that, in this particular case, the defendant had not been denied counsel of his choice or access to funds. Accordingly, the defendant's claim is without merit.

V

The defendant also claims that the trial court improperly continued to conduct the defendant's trial despite the existence of an automatic appellate stay, which rendered the results of the trial void ab initio. Specifically, the defendant argues: "The trial court ignored the automatic appellate stay that [arose] pursuant to Practice Book § 61-13 when it proceeded to trial on July 7, 2014. During the stay, the trial court lacked jurisdiction to conduct proceedings; consequently, [the defendant's] trial and convictions on all counts are void ad initio. He should be afforded a new trial where the trial court properly holds jurisdiction to conduct proceedings." The defendant asserts that he had obtained an automatic stay pursuant to Practice Book § 61-13 (b), and that only the Appellate Court could consider

whether his appeal was viable.

The state argues: "Contrary to the defendant's assertion . . . the filing of his fourth jurisdictionally defective interlocutory appeal did not result in an enforceable appellate stay and his trial was not void ab initio." (Citation omitted.) The state contends that the court properly proceeded to trial. We agree with the state.

The following facts inform our review. On July 1, 2014, the defendant filed a pro se interlocutory appeal from the trial court's denial of his motion to reconsider the appointment of a special public defender in lieu of Riccio and Moynahan, which was docketed as AC 36918. At a July 2, 2014 hearing, the defendant told the court that an appellate stay of further trial court proceedings was in place because he had filed another interlocutory appeal. The court asked counsel if either of them had filed the appeal, to which they responded in the negative. The court explained that there was no hybrid representation in this state, and it essentially stated that it would not recognize a stay in the proceeding where the defendant had filed another interlocutory appeal. The court resumed the hearing.

The evidentiary portion of the defendant's criminal trial commenced on July 7, 2014. On July 8, 2014, the state filed a motion to dismiss the defendant's July 1, 2014 interlocutory appeal on the ground that the Appellate Court lacked jurisdiction, and it requested that the matter be reviewed expeditiously.[15] While the appeal was pending, the jury, on July 11, 2014, returned its verdict. The defendant claims that the trial court proceeded in violation of the automatic stay and that his convictions, therefore, are void. We disagree.

Whether an appellate stay of execution was in effect during the underlying criminal trial requires us to consider our rules of practice and case law concerning appellate stays. "The interpretive construction of the rules of practice is to be governed by the same principles as those regulating statutory interpretation. . . . The interpretation and application of a statute, and thus a Practice Book provision, involves a question of law over which our review is plenary." (Internal quotation marks omitted.) *Cunniffe* v. *Cunniffe*, 150 Conn. App. 419, 429, 91 A.3d 497, cert. denied, 314 Conn. 935, 102 A.3d 1112 (2014).

The specific practice book rule for stays in criminal cases that the defendant argues governs his claim is Practice Book § 61-13 (b). Practice Book (Rev. to 2014) § 61-13 provides in relevant part: "Except as otherwise provided in this rule, a judgment in a criminal case shall be stayed from the time of the judgment until the time to take an appeal has expired, and then, if an appeal is filed, until ten days after its final determination. The stay provisions apply to an appeal from a judgment, to an appeal from a judgment on a petition for a new trial

and to a writ of error, where those matters arise from a criminal conviction or sentence. Unless otherwise provided in this rule, all stays are subject to termination under subsection (d). . . .”

"(b) Appeal by defendant from presentence order

"In an appeal from a presentence order where the defendant claims that an existing right, such as a right not to be tried, will be irreparably lost if the order is not reviewed immediately, the appeal shall stay automatically further proceedings in the trial court. . . ."

As our Supreme Court has observed: "In a criminal proceeding, there is no final judgment until the imposition of a sentence. *State* v. *Coleman*, 202 Conn. 86, 89, 519 A.2d 1201(1987); *State* v. *Grotton*, 180 Conn. 290, 293, 429 A.2d 871 (1980). . . . The general rule is . . . that interlocutory orders in criminal cases are not immediately appealable. *United States* v. *MacDonald*, 435 U.S. 850, 857, 98 S. Ct. 1547, 56 L. Ed. 2d 18 (1978) (denial of motion for speedy trial); *Cogen* v. *United States*, 278 U.S. 221, 227–28, 49 S. Ct. 118, 73 L. Ed. 275 (1929) (denial of motion for return of seized property); *State* v. *Atkins*, 203 Conn. 33, 34, 522 A.2d 1234 (1987) (finding of probable cause to believe criminal offense has been committed); *In re Juvenile Appeal (85–AB)*, 195 Conn. 303, 306, 488 A.2d 778 (1985) (denial of a motion to transfer to criminal docket) [superseded by statute as stated in *In re Keijam T.*, 221 Conn. 109, 602 A.2d 967 (1992)]; *State* v. *Longo*, 192 Conn. 85, 89, 469 A.2d 1220 (1984) (denial of motion for youthful offender status); *State* v. *Spendolini*, 189 Conn. 92, 97, 454 A.2d 720 (1983) (denial of motion for accelerated rehabilitation); *State* v. *Grotton*, supra, 295–96 (granting of state's motion to take nontestimonial evidence from defendant; *State* v. *Kemp*, 124 Conn. 639, 646–47, 1 A.2d 761 (1938) (permitting defendant access to grand jury minutes); compare *State* v. *Aillon*, 182 Conn. 124, 126, 438 A.2d 30 (1980) [(colorable double jeopardy claim immediately appealable)], cert. denied, 449 U.S. 1090, 101 S. Ct. 883, 66 L. Ed. 2d 817 (1981)." *State* v. *Ayala*, 222 Conn. 331, 339, 610 A.2d 1162 (1992).

As our Supreme Court explained: "[W]e have been disinclined . . . to extend the privilege of an interlocutory appeal in criminal cases beyond the double jeopardy circumstance. This reluctance stems principally from our concern that to allow such appeals would greatly delay the orderly progress of criminal prosecutions in the trial court. . . . [T]he opportunity to appeal in such a situation might well serve the purpose of parties who desire for their own ends to postpone the final determination of the issues. . . . It has been widely recognized that strict adherence to the final judgment rule is necessary in criminal cases because the delays and disruptions attendant upon intermediate appeal are especially inimical to the effective and fair administration of the criminal law." (Internal quotation

marks omitted.) *State* v. *Fielding*, 296 Conn. 26, 40, 994 A.2d 96 (2010); see also *Cunniffe* v. *Cunniffe*, supra, 150 Conn. App. 430–31 (holding that no appellate stay is created under Practice Book § 61-11 by appeal from order that is not immediately appealable; "[t]o conclude otherwise would risk undermining our important public policy disfavoring a disruptive and inefficient judicial process because it would provide parties with a tool to unduly delay proceedings by filing premature appeals").

"We have recognized, however, in both criminal and civil cases, that certain otherwise interlocutory orders may be final judgments for appeal purposes, and the courts may deem interlocutory orders or rulings to have the attributes of a final judgment if they fit within either of the two prongs of the test set forth in *State* v. *Curcio*, [191 Conn. 27, 31, 463 A.2d 566 (1983)]. . . . *BNY Western Trust* v. *Roman*, 295 Conn. 194, 202, 990 A.2d 853 (2010); see *State* v. *Jenkins*, 288 Conn. 610, 618, 954 A.2d 806 (2008). Under *Curcio*, interlocutory orders are immediately appealable if the order or ruling (1) terminates a separate and distinct proceeding, or (2) so concludes the rights of the parties that further proceedings cannot affect them." (Internal quotation marks omitted.) *State* v. *Fielding*, supra, 296 Conn. 37. For an interlocutory order to be immediately appealable pursuant to Practice Book § 61-13 (b), therefore, it must meet the *Curcio* test. Absent meeting this test, there is no automatic appellate stay when a party takes a § 61-13 (b) appeal.

"The first prong of the *Curcio* test . . . requires that the order being appealed from be severable from the central cause of action so that the main action can proceed independent of the ancillary proceeding. . . . Satisfaction of the second prong of the *Curcio* test requires the parties seeking to appeal to establish that the trial court's order threatens the preservation of a right *already secured to them* and that that right will be *irretrievably lost* and the [party] *irreparably harmed* unless they may immediately appeal. . . . An essential predicate to the applicability of this prong is the identification of jeopardy to [either] a statutory or constitutional right that the interlocutory appeal seeks to vindicate." (Citations omitted; emphasis added; internal quotation marks omitted.) *Cunniffe* v. *Cunniffe*, supra, 150 Conn. App. 431–32. "[T]he second prong of *Curcio* requires that the trial court's order threaten the preservation of a *right* already secured and only then do we examine whether that *right* will be irretrievably lost and the party irreparably harmed unless it may immediately appeal." (Emphasis in original.) *State* v. *Fielding*, supra, 296 Conn. 43 n.10.

In the present case, we are dealing with an interlocutory order in a criminal case. Both Practice Book § 61-13 (b) and *Curcio*'s second prong require a showing that the court's order from which the defendant sought

to appeal threatened the loss of an *existing right already secured to him*. Both also require that the existing right would be irretrievably lost, such that the defendant would be irreparably harmed, without the ability to take an immediate appeal. The defendant did not meet this requirement, and, therefore, the trial court properly declined to recognize an automatic stay of the proceedings.

On appeal, the defendant argues that the court violated an automatic appellate stay because the right at issue in his interlocutory appeal, AC 36918, was his right to counsel or, perhaps more specifically, his "right" to be appointed a special public defender rather than his former attorneys. We conclude that the court did not proceed in violation of automatic stay, because there was no automatic stay in the proceedings. The defendant's interlocutory appeal did not involve an *existing right* that already was secured to him, nor would the defendant have been irreparably harmed, if he were not permitted an immediate appeal from the court's order.

Here, this defendant was not indigent and clearly had no existing right to the appointment of a special public defender in lieu of the reappointment of prior counsel. Furthermore, to be sure, were the defendant not able to appeal immediately the court's order denying his motion to reconsider his request for the appointment of a special public defender, he would proceed to trial, where there exists the possibility that he could be found not guilty, thereby suffering no harm from the court's denial of his motion to reconsider the appointment of a special public defender. If, on the other hand, he were to be found guilty and a final judgment were rendered by the court's imposition of the sentence, the defendant then would have a right to appeal from any adverse rulings on his motion to reconsider the appointment of a special public defender; see, e.g., *State* v. *Guitard*, 61 Conn. App. 531, 535–39, 765 A.2d 30 (Appellate Court considered and rejected defendant's postconviction challenge to trial court's denial of motion for standby counsel), cert. denied, 255 Conn. 952, 770 A.2d 32 (2001); which is exactly what the defendant has done in the present appeal. See also part VI of this opinion. If the defendant were successful on that claim in this appeal, he then would secure a new trial with the assistance of the special public defender. Under either scenario, he would not have lost any right that is irretrievable, and he would have suffered no harm that is irreparable.

Consequently, because the defendant's interlocutory appeal does not fall within Practice Book § 61-13 (b) or *Curcio*'s second prong;[16] see *State* v. *Fielding*, supra, 296 Conn. 42–43 (trial court order that forms basis of interlocutory appeal must threaten preservation of right *already secured* and said right must *exist independently* of order from which appeal has been taken); no

enforceable appellate stay arose from his filing of the appeal. See generally *Cunniffe* v. *Cunniffe*, supra, 150 Conn. App. 429–30 (holding that no enforceable appellate stay of execution results from filing jurisdictionally infirm appeal); cf. *Hartford Federal Savings & Loan Assn.* v. *Tucker*, 192 Conn. 1, 5, 469 A.2d 778 (1984) ("[b]ecause the order appointing the rent receiver was not immediately appealable, the defendant's claim to a stay of the receivership pending an appeal is untenable").

Accordingly, we conclude that the court did not act in violation of an appellate stay when it proceeded with trial in spite of the defendant's fourth interlocutory appeal from a nonappealable order. The defendant's appeal was not jurisdictionally viable at the time it was filed, and, therefore, the court did not act in violation of an automatic appellate stay.

VI

The defendant next claims that the trial court abused its discretion by not appointing a special public defender, ultimately violating his constitutional rights to counsel and to due process of law. He argues that he "did not have access to his assets to a degree sufficient to fund his defense . . . . An indigent defendant had a better chance of a funded and effective defense than [the defendant]. The mental disease or defect defense is complex and expensive. The burden of proof falls to the defendant, requiring him to assert a case-in-chief, not merely cross-examine state witnesses and then rest; it requires the testimony of mental health professionals with high hourly rates. Raising this defense made the case extraordinary; the court should have appointed assigned counsel." We are not persuaded.

The following facts inform our review. On April 10, 2013, there was a question raised as to whether the defendant might be indigent for purposes of qualifying for a public defender. The defendant then applied for those services. On April 12, 2013, Butler, an attorney with the public defender's office, informed the court that the defendant had filed an application with his office, but that it had been determined that the defendant was not indigent and, therefore, did not qualify for the services of his office. The defendant stated that Butler had been very helpful, and he thanked him for his assistance. The defendant then reiterated his desire to represent himself, which the court permitted, but the court also appointed Riccio and Moynahan as standby counsel. At that time, the defendant also confirmed for the court that he had sufficient funds for his experts.

On April 23, 2013, the defendant appealed to the Superior Court the decision of the public defender's office that he did not qualify financially for its services. In its memorandum of decision dated February 20, 2014,

issued after a full evidentiary hearing on the matter, the court upheld that decision, concluding that the defendant was not indigent and had funds available to him.

On March 12, 2014, when the court discussed its February 20, 2014 decision, the defendant stated: "I do believe, that should extraordinary circumstances arise, as envisioned under the statute, over the course of the remaining proceedings in this matter, that I would potentially again seek a public defender based on extraordinary circumstances, which is at the discretion . . . of Your Honor or the presiding judge."

On June 12, 2014, after learning that his appellate petitions had been dismissed, all stays had been lifted, and the court was ready to proceed with jury selection, the defendant told the court that he wanted to withdraw his invocation of his right to self-representation. In response, the court reappointed Riccio and Moynahan, both of whom had been either full counsel or standby counsel throughout this matter. The defendant objected to their reappointment and stated that it was "not his conclusion that they [should] not continued to represent [him]," but, rather, it was Riccio and Moynahan who did not want to represent him. The defendant asked for the appointment of different counsel, which the court denied.[17] The defendant thereafter filed a motion asking the court to reconsider its decision and requesting the appointment of a special public defender. During oral argument on the motion to reconsider, the defendant acknowledged that he had a "cordial" relationship with Riccio and Moynahan, but he stated that it would be "unfair" to them to be brought back in as full counsel. The court denied the motion. The defendant now claims that the court abused its discretion in not appointing a special public defender. We are not persuaded.

Practice Book § 44-4 provides: "When a defendant has been permitted to proceed without the assistance of counsel, the judicial authority may appoint standby counsel, especially in cases expected to be long or complicated or in which there are multiple defendants. A public defender or special public defender may be appointed as standby counsel only if the defendant is indigent and qualifies for appointment of counsel under General Statutes § 51-296, *except that in extraordinary circumstances the judicial authority, in its discretion, may appoint a special public defender for a defendant who is not indigent.*" (Emphasis added.)

Here, the defendant did not qualify financially for the services of the office of the public defender. He argues, nonetheless, that the court should have appointed a special public defender as an exercise of its discretion because his defense of mental disease or defect made the case extraordinary. We recognize that our Supreme Court recently held that "an indigent self-represented

criminal defendant has a fourteenth amendment due process right to publically funded expert or investigative services, to the extent that such services are reasonably necessary to formulate and to present an adequate defense to pending criminal charges"; *State* v. *Wang*, 312 Conn. 222, 231, 92 A.3d 220 (2014); and the Division of Public Defender Services "is statutorily authorized to fund the reasonably necessary ancillary defense costs of indigent self-represented criminal defendants." Id., 249. In this case, however, the defendant does not explain why the circumstances of this particular case or of his defense of mental disease or defect are any more "extraordinary" pursuant to Practice Book § 44-4 than those of any other case, or whether he contends that the court always should appoint a special public defender for defendants who raise such a defense or who have limited funds but are not indigent.

Furthermore, the facts of this case demonstrate that on April 12, 2013, the defendant confirmed for the court that he had sufficient funds for his experts. At the March 12, 2014 hearing, the defendant told the court that if extraordinary circumstances arose, he would alert the court, and he would "seek a public defender based on extraordinary circumstances" at that time. On June 12, 2014, approximately one month after the court had precluded his defense of mental disease or defect, the defendant informed the court that he no longer wanted to represent himself because of "severe anxiety and mental issues" associated with that anxiety. He stated that this was an extraordinary circumstance and that he needed appointed counsel. In response, the court reappointed Riccio and Moynahan, both of whom were quite familiar with the case. The defendant then filed a motion for reconsideration, asking the court to appoint a special public defender. The court denied the motion.

Although the defendant claims that this case was so extraordinary that it was an abuse of discretion for the court to deny him the services of a special public defender, he points to nothing specific that sets this case apart from other cases in which a defendant may have limited funds, such that it would be an abuse of the trial court's discretion not to appoint a special public defender. In this case, the court reappointed Riccio and Moynahan, seasoned trial attorneys, as full counsel for the defendant; both the public defender's office and the trial court had determined that the defendant was not indigent for purposes of entitlement to public defender services; and the defendant, himself, informed the court in April, 2013, that he had sufficient funds for his experts. On the basis of the foregoing, we find no merit to the defendant's claim.

VII

The defendant next claims that the trial court violated his rights to due process of law and to present a defense

when it refused to instruct the jury on the defenses of renunciation and diminished capacity as requested by the defendant. After setting forth our law concerning a defendant's entitlement to an instruction of a theory of defense, we will consider each requested instruction in turn.

"A fundamental element of due process is the right of a defendant charged with a crime to establish a defense . . . . We have said that a defendant is entitled to have the court present instructions to the jury relating to any theory of the defense for which there is any foundation in the evidence, even if weak or incredible. . . . We must consider the evidence presented at trial in the light most favorable to supporting the defendant's request to charge. . . . An instruction on a legally recognized theory of defense, however, is warranted only if the evidence indicates the availability of that defense. . . . The trial court should not submit an issue to the jury that is unsupported by the facts in evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Adams*, 225 Conn. 270, 283, 623 A.2d 42 (1993).

A

The defendant claims that the trial court violated his rights to due process of law and to present a defense when it refused to instruct the jury on the defense of renunciation. He argues: "[The defendant] was entitled to a renunciation instruction based on the evidence. Assuming, arguendo, that [he] had the intent to kill his wife, he abandoned his attempt completely, voluntarily, and motivated only by his own purpose and intent and not by outside forces." We disagree.

"The defendant was entitled to have the court instruct the jury on the defense of renunciation if there was any evidence to raise a reasonable doubt concerning the existence of the defense. . . . The question on appeal is whether, viewing the evidence most favorable to the defendant's request for charge, we perceive any evidence supporting a defense of renunciation presented at trial. . . .

"At the outset, we note that the defense of renunciation is extremely narrow. . . . Renunciation generally requires not only desistance, but more active rejection, and usually contains specific subjective requirements, such as a complete and voluntary renunciation. . . . Connecticut has patterned its criminal code after the Model Penal Code, which permits the defense only if the defendant terminates his complicity by, inter alia, wholly depriving his complicity of its effectiveness in the commission of the offense. . . . A mere change of heart or flight from the crime scene does not establish the defense of renunciation." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Adams*, supra, 225 Conn. 283–84.

Here, although the defendant argues that the evi-

dence demonstrated that "he abandoned his attempt [to kill] completely, voluntarily, and motivated only by his own purpose and intent and not by outside forces," it is clear from the evidence that any purported abandonment occurred *after* the attempt to kill had been completed.

"*An attempt is complete* and punishable, regardless of its failure due to interruption, other extrinsic causes or its likelihood of success, *if an act is done with intent to commit the crime, which is adapted to the perpetration of it* . . . . The act or acts must constitute more than mere preparation but at least must be the start of a line of conduct which will lead naturally to the commission of a crime which appears to [a defendant] at least to be possible of commission by the means adopted. . . . A defendant, therefore, is criminally culpable because the conduct causes a sufficient risk of harm to be treated as a crime in and of itself." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Rochette*, 25 Conn. App. 298, 305, 594 A.2d 1006, cert. denied, 220 Conn. 912, 597 A.2d 337 (1991), cert. denied, 502 U.S. 1045, 112 S. Ct. 905, 116 L. Ed. 2d 806 (1992). "An attempt is an inchoate crime, meaning that it is unfinished or begun with the proper intent but not finished." (Internal quotation marks omitted.) *State* v. *Jones*, 96 Conn. App. 634, 641, 902 A.2d 17, cert. denied, 280 Conn. 919, 908 A.2d 544 (2006).

In the present case, there was no evidence that the defendant had abandoned or renunciated an attempt to kill his wife *before* he acted on his attempt to kill her. See *State* v. *Carter*, 141 Conn. App. 377, 391–92, 61 A.3d 1103 (2013) (defendant's change of mind and abandonment of original purpose to shoot and injure victim was irrelevant because, by that time, attempt crime already completed), aff'd, 317 Conn. 845, 120 A.3d 1229 (2015). Accordingly, there is no merit to the defendant's claim that the court improperly declined to charge on a defense of renunciation.

B

The defendant next claims that the trial court violated his rights to due process of law and to present a defense when it refused to instruct the jury on the defense of diminished capacity. He argues that the testimony at trial "reasonably supported a diminished capacity instruction. His conduct was precipitated by service of divorce papers, rendering him devastated, irrational, and suicidal. His behavior thereafter vacillated between volatile and a flat affect." We disagree.

The record reveals that the defendant submitted a request to charge on the defense of diminished capacity on July 7, 2014. In arguing his entitlement to such a charge, the defendant argued that the evidence demonstrated that he was extremely upset after having been served with divorce papers, that he was irrational, and

that he wanted to kill himself. The state argued that just because the defendant had stated that he wanted to kill himself did not mean that there was evidence that he had diminished capacity while he was committing these crimes. The court agreed with the state, holding that there was no evidence that the defendant had an inability to form the specific intent to commit the underlying crimes, and, therefore, he was not entitled to a charge on diminished capacity.

"The doctrine of diminished capacity means that if the defendant, because of a limited or impaired mental capacity, did not have that specific intent to commit the acts which comprise the crime [charged] because of a limited or impaired mental capacity, then the element of intent would not have been proven in this case. . . .

"Evidence with regard to a defendant's mental capacity is relevant in any case where a specific intent is an essential element of the crime involved . . . . Such evidence is admitted not for the purpose of exempting a defendant from criminal responsibility, but as bearing upon the question of whether he possessed, at the time he committed the act, the necessary specific intent, the proof of which was required to obtain a conviction. . . .

"An instruction on diminished capacity would be warranted, therefore, if sufficient evidence was introduced to justify [such an instruction]. . . . The state had the burden of proving the element of intent beyond a reasonable doubt. . . . To warrant consideration of diminished capacity, however, the defendant must have presented evidence [that] might have raised a reasonable doubt as to the existence of the specified mental state." (Citations omitted; internal quotation marks omitted.) *State* v. *Jordan*, 129 Conn. App. 215, 224–26, 19 A.3d 241, cert. denied, 302 Conn. 910, 23 A.3d 1248 (2011).

Although "a defendant need [not] present expert testimony to demonstrate the existence of a mental impairment, as lay testimony concerning such impairment is admissible . . . the evidence of such impairment must be of such a nature that the jury is entitled to rely upon it in assessing whether a defendant had the ability to formulate the requisite intent for the commission of the crime. We evaluate the evidence to determine whether the jury reasonably could have drawn a conclusion concerning an inability to form the specific intent. In so doing, we are mindful that the jury, as fact finder, is not entitled to engage in speculation or conjecture; it may only draw reasonable inferences from competent evidence." (Citation omitted.) *State* v. *Bharrat*, 129 Conn. App. 1, 14–15, 20 A.3d 9, cert. denied, 302 Conn. 905, 23 A.3d 1243 (2011).

In the present case, we conclude that the court properly declined to instruct the jury on diminished capacity.

Reviewing the evidence in the light most favorable to supporting the defendant's instructional request demonstrates that the defendant was angry and distraught at the time he committed the charged crimes and that, after committing the crimes, he stated a desire to kill himself and may have attempted to do so. This evidence, however, reveals nothing about the defendant's capacity for forming the requisite specific intent at the time the crimes were committed. The defendant cites no case that stands for the proposition that being angry or distraught, or having suicidal ideation, necessarily prohibits one from forming a specific intent to commit a crime that would bring the conduct within the purview of the doctrine of diminished capacity. Because the defendant failed to present any evidence that he had an inability to form the requisite specific intent for the commission of the crimes charged, we conclude that the court properly declined to instruct on the doctrine of diminished capacity.

The judgment is affirmed.

In this opinion the other judge concurred.

* In accordance with our policy of protecting the privacy interests of the victims of risk of injury to a child or family violence, we decline to use the defendant's full name or identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

[1] General Statutes § 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

[2] Practice Book § 40-19 provides: "In an appropriate case the judicial authority may, upon motion of the prosecuting authority, order the defendant to submit to a psychiatric examination by a psychiatrist designated for this purpose by the prosecuting authority. No statement made by the defendant in the course of any examination provided for by Sections 40-17 through 40-19, whether the examination shall be with or without the consent of the defendant, shall be admitted in evidence against the defendant on the issue of guilt in any criminal proceeding. A copy of the report of the psychiatric examination shall be furnished to the defendant within five days after the receipt thereof by the prosecuting authority."

[3] On June 13, 2011, in his marital dissolution action, the defendant had been awarded 25 percent of the marital assets. At the time of the August 20, 2012 inquiry by the court in the present case, the defendant had appealed from the court's judgment in the dissolution action. Additionally, the defendant's wife had instituted a civil assault action against the defendant and had been granted a prejudgment remedy of $4.1 million.

[4] On April 23, 2013, pursuant to General Statutes § 51-297 (g) and Practice Book § 37-6, the defendant also appealed to the Superior Court the decision of the public defender's office that he did not qualify financially for the services of a public defender because he was not indigent.

[5] In total, the defendant filed five interlocutory appeals in this case, all of which were dismissed by this court: (1) AC 36007, filed on August 26, 2013, dismissed November 20, 2013, cert. denied, 311 Conn. 907, 83 A.3d 603 (2014); (2) AC 36767, filed on May 5, 2014, dismissed May 21, 2014, cert. dismissed, 312 Conn. 916, 93 A.3d 598 (2014); (3) AC 36769, filed on May 5, 2014, dismissed May 21, 2014, cert. dismissed, 312 Conn. 916, 93 A.3d 598 (2014); (4) AC 36918, filed on July 1, 2014, dismissed July 23, 2014, cert. denied, 313 Conn. 901, 99 A.3d 634 (2014); (5) AC 36977, filed on July 28, 2014, dismissed August 20, 2014, cert. denied, 313 Conn. 902, 99 A.3d 634 (2014).

[6] The court, at that time, wanted to hear the defendant's appeal from the denial of services by the office of the public defender. See footnote 4 of this opinion. The defendant, however, refused to proceed at that time citing, as his reason, his right to appeal from the court's termination of the appellate

stay within ten days of the court's ruling. See Practice Book § 61-14. The defendant did appeal from the trial court's termination of the stay in AC 36007, which appeal we dismissed, and the Supreme Court denied the defendant's petition for certification to appeal on January 8, 2014. See *State* v. *J.M.F.*, 311 Conn. 907, 83 A.3d 603 (2014).

[7] We will discuss this decision in more detail in part VI of this opinion.

[8] Practice Book § 40-5 provides in relevant part: "If a party fails to comply with disclosure as required under these rules, the opposing party may move the judicial authority for an appropriate order. The judicial authority hearing such a motion may enter such orders and time limitations as it deems appropriate, including, without limitation, one or more of the following:

"(1) Requiring the noncomplying party to comply . . .

"(4) Prohibiting the noncomplying party from introducing specified evidence . . .

"(7) Imposing appropriate sanctions on the counsel or party, or both, responsible for the noncompliance; or

"(8) Entering such other order as it deems proper."

[9] Due to the defendant having filed two of his interlocutory appeals in this case, jury selection did not commence on May 27, 2014, but was delayed until June 17, 2014.

[10] Because the defendant does not provide a separate analysis of a violation of the Connecticut constitution, we confine our analysis to the defendant's claims under the federal constitution. See, e.g., *State* v. *Roger B.*, 297 Conn. 607, 611 n.7, 616 n.13, 999 A.2d 752 (2010).

[11] The record demonstrates that Moynahan filed motions to withdraw on July 30, 2012, and October 1, 2012, and that Riccio filed motions to withdraw on August 3, 2012, and October 11, 2012. Riccio and Moynahan brought the motions on the basis of their claimed financial hardship due to the defendant's nonpayment. The court denied those motions.

[12] Practice Book § 44-3 provides: "A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself or herself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self-representation."

[13] The defendant does not cite any specific portion of the June 18, 2014 hearing in the body of his brief, but cites in a footnote, as further proof of the court's obligation to conduct a competency hearing or order an evaluation, the following regarding that hearing: "[The defendant] stated, '[I]t would be extremely psychologically taxing' to sit through trial and that he could not 'offer any assistance to [his] legal counsels.' . . . He questioned whether he could 'competently endure trial,' and he did not want to 'end up committed again.' . . . The state argued that he fulfilled the 'very low standard of competency.' . . . The court dismissed [the defendant's] concerns as 'stressors for everybody involved at this stage of the proceedings.' " (Citations omitted.)

[14] There is a distinction between competency to stand trial and competency to represent one's self, and the two are treated differently under our law. In *Indiana* v. *Edwards*, 554 U.S. 164, 177–78, 128 S. Ct. 2379, 171 L. Ed. 2d 345 (2008), "the United States Supreme Court clarified that individual states may adopt standards for determining whether a defendant is competent to represent himself that are more demanding than the standard used for determining whether a defendant is competent to stand trial. . . . Accordingly, although a more stringent standard was not constitutionally mandated, this court elected to adopt such a standard . . . . Under this standard, when a trial court is presented with a mentally ill or mentally incapacitated defendant who has been found competent to stand trial . . . a defendant's competency to represent himself would depend on his ability to carry out the basic tasks needed to present his own defense without the help of counsel . . . notwithstanding any mental incapacity or impairment serious enough to call that ability into question." (Citations omitted; internal quotation marks omitted.) *State* v. *Connor*, 321 Conn. 350, 356–57, 138 A.3d 265 (2016).

[15] The appeal in AC 36918 was dismissed on July 23, 2014, and the defendant then filed a petition for certification to appeal from the dismissal. The Supreme Court denied the petition on September 9, 2014. See footnote 5 of this opinion.

[16] The defendant does not address *Curcio*'s first prong specifically. We note, however, that he does not meet its requirements either. Indeed, the court's decision did not terminate any proceeding separate and distinct from the defendant's criminal case; rather, it was a step along the way to the determination of whether the defendant was guilty of the charges against him.

[17] The defendant did not specify any particular attorney.